# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

INTERLEASE, INC.
  11924 Forest Hill Blvd
  Suite 22207
  Wellington, FL 33414

                Plaintiff,

    v.

THE SOCIALIST PEOPLE'S
LIBYAN ARAB JAMAHIRIYA
  Ministry of Foreign Affairs
  Tripoli, Libya

and

LIBYAN EXTERNAL SECURITY
ORGANIZATION, a/k/a Jamahiriya
Security Organization
  Ministry of Foreign Affairs
  Tripoli, Libya

                Defendants.

Civil Action No.

**COMPLAINT FOR
COMPENSATORY AND
PUNITIVE DAMAGES
PURSUANT TO 28 U.S.C.
§ 1605A**

Plaintiff Interlease, Inc. brings this action seeking property and related damages arising

out of the September 19, 1989 terrorist bombing of Union de Transports Aeriens ("UTA") Flight

772 over Niger, Africa. Defendants in this action have already been found liable by this Court

for the bombing, based on the same facts alleged in this Complaint. *See Pugh v. Socialist

People's Libyan Arab Jamahiriya*, 530 F. Supp. 2d 216 (D.D.C. 2008); *Pugh v. Socialist

People's Libyan Arab Jamahiriya,* No. 02-2026, Order (D.D.C. April 9, 2007) (Docket No. 69);

*Pugh v. Socialist People's Libyan Arab Jamahiriya,* No. 02-2026, 2006 WL 2384915 (D.D.C.

May 11, 2006). Judgment was entered against these defendants on January 24, 2008 in favor of

the estates and immediate family members of the seven passengers aboard Flight 772 who were

United States citizens. The total judgment against the Libyan State was $1,635,583,302. *See*

*Pugh v. Socialist People's Libyan Arab Jamahiriya*, 02-2026, Order (D.D.C. Jan. 24, 2008)

(Docket No. 97). In addition, this Court entered judgment on January 24, 2008 in favor of

Plaintiff Interlease against the individual agents of the Libyan State (listed herein at ¶¶ 9-14) in

their individual capacities, based on the same facts alleged below. *See id.* The amount of that

Judgment was $361,350,237. Interlease's claims against the Libyan State, defendants here, were

dismissed by this Court under the predecessor provisions to 28 U.S.C. § 1605A (*see Pugh v.*

*Socialist People's Libyan Arab Jamahiriya,* 290 F. Supp. 2d 54, 60-61 (D.D.C. 2003)), and are

now refiled in this related action, pursuant to Pub.L 110-181, § 1083(c).

Plaintiff, here, seeks judgment against Defendants the Socialist People's Libyan Arab

Jamahiriya and the Libyan External Security Organization, jointly and severally, and in support

of its Complaint, alleges as follows:

## JURISDICTION AND VENUE

1.     Jurisdiction over the subject matter of this case arises under 28 U.S.C. § 1330(a).

Defendants the Socialist People's Libyan Arab Jamahiriya, and the Libyan External Security

Organization are subject to suit in the courts of the United States for various federal and state

causes of action pursuant to the Foreign Sovereign Immunities Act, as amended by Pub. L. 110-

181, § 1083 (2008), 28 U.S.C. § 1605A, and related statutes.

2.     This case arises out of the same facts as, and is related to, *Pugh v. Socialist*

*People's Libyan Arab Jamahiriya*, No. 02-2026, which was timely commenced in this Court

under 28 U.S.C. § 1605(a)(7), the predecessor provision to 28 U.S.C. § 1605A. Pursuant to Pub.

L. 110-181, § 1083(c), the *Pugh* Plaintiffs moved on March 25, 2008 to have the Judgment be

"given effect" as if it had originally been entered pursuant to 28 U.S.C. § 1605A. This action is

brought pursuant to, and within 60 days of enactment of, the January 2008 amendments to the

Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 *et seq.*, set out in the National Defense

Authorization Act for Fiscal Year 2008, Pub. L. 100-181, § 1083 (2008), to be codified at 28

U.S.C. §§ 1605A, 1610 ("NDAA 2008 Act").

3.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(f)(4).

## THE PARTIES

4.      Plaintiff Interlease, Inc. is a corporation organized under the laws of the State of

Florida with its principle place of business in the State of Florida. It owned and leased to UTA

the DC-10 aircraft that was destroyed in the terrorist bombing which forms the basis of this

lawsuit. Interlease suffered property loss as a result of an act of (1) "extrajudicial killing" as

defined in section 3 of the Torture Victim Protection Act of 1991 (28 U.S.C. § 1350 note); and

(2) "aircraft sabotage" as defined in Article 1 of the Convention for the Suppression of Unlawful

Acts Against the Safety of Civil Aviation.

5.      Defendant Socialist People's Libyan Arab Jamahiriya ("Libya") is a foreign

sovereign that from 1979 until 2006 was designated a state sponsor of terrorism pursuant to

section 6(j) of the Export Administration Act of 1979, 50 U.S.C. § 2405(j), and section 620A of

the Foreign Assistance Act of 1961, 22 U.S.C. § 2371.

6.      Defendant the Libyan External Security Organization ("LESO") is the Libyan

intelligence service, which functions both within and beyond Libyan territory. LESO, acting as

an agent of Libya, performed acts within the scope of its agency within the meaning of 28 U.S.C.

§ 1605A and 28 U.S.C. § 1605 note, which caused the bombing of UTA Flight 772.

7.      The Socialist People's Libyan Arab Jamahiriya and LESO were found liable to

individual victims of UTA Flight 772 for the planning and execution of the bombing, pursuant to

28 U.S.C.A. § 1605(a)(7). *See Pugh v. Socialist People's Libyan Arab Jamahiriya*, 530 F. Supp.

2d 216 (D.D.C. 2008); *Pugh v. Socialist People's Libyan Arab Jamahiriya,* No. 02-2026, Order

(D.D.C. April 9, 2007) (Docket No. 69); *Pugh v. Socialist People's Libyan Arab Jamahiriya,* No.

02-2026, 2006 WL 2384915 (D.D.C. May 11, 2006). Plaintiffs in that action have petitioned this

Court, pursuant to Pub.L. 110-181, § 1083(c)(2), to have the *Pugh* judgment be "given effect" as

if the action had originally been brought and the judgment entered pursuant to 28 U.S.C.

§ 1605A.

       8.     Agent Muammar Qadhafi is, and at all relevant times was, the Head of State of

Libya and thus an official and agent of Libya. Acting within the scope of his office,

employment, and/or agency, Qadhafi ordered, caused, and/or assisted in causing the terrorist

bombing of Flight 772. Pursuant to 28 U.S.C. § 1605A(c), Defendant Libya is vicariously liable

for the acts of its officers, employees, or agents.

       9.     Agent Abdallah Senoussi is, and at all relevant times was, an official and agent of

Libya. At the time of the relevant events, Senoussi was the second highest-ranking official in

LESO. Acting within the scope of his office, employment, and/or agency, Senoussi caused

and/or assisted in causing the terrorist bombing of Flight 772. Pursuant to 28 U.S.C. § 1605A(c),

Defendant Libya is vicariously liable for the acts of its officers, employees, or agents.

      10.     Agent Abdallah Elazragh is, and at all relevant times was, an official and agent of

Libya. At the time of the relevant events, Elazragh was the First Secretary at the Libyan

embassy in Brazzaville, Congo, and a member of LESO. Acting within the scope of his office,

employment, and/or agency, Elazragh caused and/or assisted in causing the terrorist bombing of

Flight 772. Pursuant to 28 U.S.C. § 1605A(c), Defendant Libya is vicariously liable for the acts

of its officers, employees, or agents.

11.    Agent Issa Abdelsalam Shibani is, and at all relevant times was, an official and agent of Libya.  At the time of the relevant events, Shibani was the Head of Libya's Technical Administration of Domestic Security Services.  Acting within the scope of his office, employment, and/or agency, Shibani caused and/or assisted in causing the terrorist bombing of Flight 772.  Pursuant to 28 U.S.C. § 1605A(c), Defendant Libya is vicariously liable for the acts of its officers, employees, or agents.

12.    Agent Arbas Musbah is, and at all relevant times was, an official and agent of Libya.  At the time of the relevant events, Musbah was an explosives and air transport expert with LESO.  Acting within the scope of his office, employment, and/or agency, Musbah caused and/or assisted in causing the terrorist bombing of Flight 772.  Pursuant to 28 U.S.C. § 1605A(c), Defendant Libya is vicariously liable for the acts of its officers, employees, or agents.

13.    Agent Ibrahim Naeli is, and at all relevant times was, an official and agent of Libya.  At the time of the relevant events, Naeli was an explosives and air transport expert with LESO.  Acting within the scope of his office, employment, and/or agency, Naeli caused and/or assisted in causing the terrorist bombing of Flight 772.  Pursuant to 28 U.S.C. § 1605A(c), Defendant Libya is vicariously liable for the acts of its officers, employees, or agents.

14.    Agent Abdelsalam Hammouda El Ageli is, and at all relevant times was, an official and agent of Libya.  At the time of the relevant events, Hammouda was an officer in LESO.  Acting within the scope of his office, employment, and/or agency, Hammouda caused and/or assisted in causing the terrorist bombing of Flight 772.  Pursuant to 28 U.S.C. § 1605A(c), Defendant Libya is vicariously liable for the acts of its officers, employees, or agents.

## FACTUAL ALLEGATIONS

15.    The factual allegations in this Complaint are the same as those alleged, and based on the same evidence as submitted, in *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 02-

- 5 -

2026, which this Court found "overwhelmingly establishes defendants' culpability and involvement in the bombing of UTA Flight 772." *Pugh*, 2006 WL 2384915 at *4.

16.    Specifically, in *Pugh*, this Court found that Libya "was at the time of the [UTA Flight 772] bombing, designated as a state sponsor of terrorism." *Pugh*, 2006 WL 2384915 at *9. This Court also found that the bombing of UTA Flight 772 "satisfies the statutory definition of 'international terrorism'" and "was carried out by the [Libyan officials] while acting within the scope of their office and employment." *Id.* at *9-*10. It also found that the acts that "underlie [the UTA Flight 772 bombing] are acts for which the courts of the United States may maintain jurisdiction under section 1605(a)(7) of FSIA; namely, extrajudicial killing and aircraft sabotage." *Id.* Finally, this Court has already held that the facts as alleged below and proven in *Pugh* establish that because of Defendants' actions, "Interlease was deprived of its property – the DC 10 aircraft – and the income associated with the long-term lease agreement with UTA, and the victims were deprived of their lives." *Id.* at *10.

17.    Defendant Libya has an unfortunately long history of engaging in and supporting terrorist acts. Since the early 1970s, Libyan leader Muammar Qadhafi has publicly announced support for extremist movements, and has established ties with dozens of terrorist organizations around the world. Terrorism became an important instrument in Libyan foreign policy and was frequently employed to advance Libya's agenda.

18.    Throughout the 1980s, Libya ran terrorist training camps and supported terrorist organizations. During this time, both directly and through material support provided to terrorist organizations including Hizbollah (also known as Islamic Jihad), a politico-paramilitary terrorist organization operating in Lebanon, Libya engaged in a concerted campaign of terrorist activities.

19.    In response to Libya's ongoing involvement in international terrorism in 1986, President Reagan ordered that all U.S. economic ties with Libya be severed and that Libyan assets in the U.S. be frozen. He also called upon other countries to launch an economic boycott against Libya.

20.    Largely in response to these sanctions, Libya subsequently engaged in a concerted campaign of terrorism against the U.S. and other Western countries. In March 1986, American targets were struck in Lebanon, Italy, and Germany. One of the most notable incidents of Libyan terrorism against Westerners was the bombing of a West Berlin discotheque, La Belle, which killed two U.S. servicemen and injured more than 200 people, most of them Westerners. In October 1996, German authorities issued arrest warrants for four Libyans suspected of initiating that bombing. On November 13, 2001, a German court found the four guilty and established a connection between the bombing and the Libyan Government.

21.    In an effort to curtail this wave of state-sponsored terrorism, and in direct response to the bombing of La Belle, the U.S. took retaliatory military action against Libya. In April 1986, the U.S. launched air strikes on government and military installations in Benghazi and Tripoli, killing dozens of people, including Qadhafi's daughter.

22.    In December 1988, a Pan Am airliner, Flight 103, exploded over Lockerbie, Scotland, killing 270 people, including 189 Americans. The American and British authorities conducted an intensive investigation spanning several years, which implicated Libya in the bombing. They concluded that Libya ordered the bombing in revenge for the 1986 American air strikes.

23.    On September 19, 1989, UTA Flight 772, which was bound for Paris from Brazzaville, Congo, with a stopover in N'Djamena, Chad, exploded over the desert in

southeastern Niger, killing all 170 aboard and destroying the aircraft. Aboard the flight were individuals from seventeen countries, including seven Americans: Bonnie Barnes Pugh, Margaret Schutzius, Mark Corder, James Turlington, Patrick Huff, Donald Warner, and Mihai Alimanestianu. The victims of the bombing died as a result of the blast, which caused, among other things, severe burns, a sudden drop in air pressure and a catastrophic impact with the earth.

24.     Upon information and belief, the bombing of UTA Flight 772 was ordered and carried out by those in the highest levels of the Libyan government, including agents Qadahfi, Senoussi, Elazragh, Naeli, Musbah, Shibani, and Hammouda, in revenge for French support of the Chadian government in opposition to Libyan insurgents.

25.     The French authorities took the lead in the investigation. For two weeks after the bombing, French paratroopers scoured the desert collecting debris, which was scattered over 50 square miles, and began the painstaking task of piecing together evidence.

26.     Examination of the electronic flight data recorder and the cockpit voice recorder, which were retrieved on September 21, 1989, revealed that there were no technical problems that could have caused the destruction of Flight 772, and that there was no warning for the explosion. Investigators began to conclude that the explosion was the result of a terrorist bombing.

27.     The French appointed their leading terrorism and forensic expert, Magistrate Judge Jean-Louis Bruguiere, to direct the investigation and gather evidence on behalf of the public prosecutor. Judge Bruguiere officially began his investigation on September 23, 1989.

28.     Although leads connecting the bombing to Iran, Syria, and Lebanon were actively pursued, as investigators began to piece together the evidence, the trail leading to Libya became clearer.

29.     The investigators recovered approximately fifteen tons of wreckage, which were sent to Paris for technical analysis. Technicians from the Central Laboratory of Paris analyzed pieces of the cargo hold of the aircraft and detected traces of explosives. The explosive was determined to be pentrite. Given these initial findings, the investigators began to pay particular attention to the forward hold of the aircraft where the explosive charge appeared to have been lodged. They determined that the explosive device had been concealed in one of the four containers that had been loaded in the forward cargo hold, in the front right portion of the plane.

30.     Among the wreckage, explosive experts found a piece of a dark gray Samsonite suitcase, the interior of which was covered with a layer of the explosive pentrite, which had also been discovered on other portions of the aircraft. They concluded that the suitcase was the likely source of the explosion. Having pinpointed the location of the explosion, investigators were able to determine that the suitcase containing the explosive must have been loaded in Brazzaville, Congo.

31.     Investigators also located a small piece of green colored printed circuit board. Specialized FBI agents, who were involved with the work of the French experts, took particular notice of the circuit board because it had sustained distortions identical to those noted in the in-flight explosion of Pan Am 103 over Lockerbie. They reported their findings to Judge Bruguiere.

32.     Investigators traced the circuit board to a Taiwanese manufacturer. From there, investigators learned that a German company, Grasslin, had ordered several thousand electroplates of the same printed circuit board model, which were used for delay counters. Then, in 1989, HP Marketing Company purchased 100 delay counter models of the printed circuit board from Grasslin, and specially modified them at the request of Defendant Shibani. The

President of HP Marketing delivered the modified circuitry to Defendant Shibani in Tripoli, Libya on July 26, 1989. During this trip, the President of HP Marketing also met with Moussa Koussa, who was then Chief of the "Mathaba," a Libyan organization providing political and military training for liberation movements throughout the world. The circuit components found in the wreckage of UTA Flight 772 matched those bought by and delivered to Shibani.

33.    Investigators then obtained confessions from one of the terrorists who took part in the attack. Bernard Yanga, a Congolese opposition figure, told investigators that he helped Defendant Abdallah Elazragh recruit a fellow Congolese militant, Apollinaire Mangatany, to carry the suitcase bomb onto UTA Flight 772. According to Yanga, Defendant Elazragh supplied Mangatany with the gray Samsonite suitcase containing the explosives, which had been brought to the Congo in a Libyan diplomatic pouch. Investigators were able to confirm that the Libyan People's Bureau of Brazzarille had received two diplomatic pouches of approximately 15 ½ pounds each on September 28 and 29, 1989.

34.    Investigators also spoke with another Libyan oppositionist who reported that another man, Whalil Jkik, had confided in him that he had been approached by Defendant Senoussi, who was accompanied by Defendants Naeli and Hammouda, to participate in a secret mission, which Mr. Jdik had understood to be the bombing of a French DC-10 airliner. Mr. Jdik refused to participate.

35.    Another Congolese citizen, Marc Mvouka, who was arrested in a Paris airport for carrying narcotics, revealed that he had learned that Mangatany and Yanga had taken a training course in the handling of explosives in Libya, and that they were involved in the bombing of Flight 772.

36.    Investigators carefully verified the statements of Yanga and Mvouka through other sources and confirmed the information provided. In addition, the Congolese Secret Service had been keeping a close watch over certain Congolese opponents in relation to the Libyan Embassy, in particular Yanga and Mangatany frequently met with Defendant Elazragh in Brazzaville in the months before the bombing.

37.    Upon information and belief, a meeting was held at LESO's headquarters in Tripoli, Libya in September 1988 at which the bombings of UTA Flight 772 and Pan Am Flight 103 were discussed and decided upon. Among others, defendants Abdullah Senoussi, then head of LESO and Qadhafi's brother-in-law, and Moussa Koussa, Deputy Foreign Minister and Qadhafi's nephew, attended that meeting.

38.    On or about October 30, 1991, Judge Bruguiere issued international arrest warrants for agents Senoussi, Elazragh, Naeli, Musbah, charging these Libyan officials with direct involvement in the bombing. Judge Bruguiere also issued international search warrants for Moussa Koussa, Libya's Deputy Foreign Minister and Qadhafi's nephew, and Abessalam Zadma, a senior intelligence official and chief of Qadhafi's personal bodyguards, who were wanted for questioning.

39.    Following these warrants and the November 1991 indictments of two Libyan intelligence agents for the bombing of Pan Am Flight 103, the United Nations Security Council adopted Resolution 731. It demanded, among other things, that Libya take steps to end its state-sponsored terrorism, turn over the two suspects in the Pan Am bombing, pay compensation to the victims, and cooperate in the investigations of the Pan Am 103 and UTA 772 bombing.

40.    In April 1992, the UN Security Council adopted Resolution 748, which imposed sanctions against Libya for its refusal to comply with the demands of UN Resolution 731. In

- 11 -

response, Libya made overtures of cooperation and gave the French the file containing the investigation conducted by the Judge of Appeal of the Supreme Court of Libya, which was undertaken in December 1991 after the arrest warrants were issued. The file contained inconsistencies with Judge Bruguiere's investigation, and the authenticity of certain documents in the file was highly questionable.

41.    In November 1993, UN Security Council Resolution 883 was adopted imposing additional sanctions on Libya in an attempt to increase the pressure for it to comply fully with the demands of Resolution 731.

42.    Despite Libya's failure to meet the proscriptions of these resolutions, the French continued their investigation of the bombing of UTA Flight 772, determined to bring justice to those responsible.

43.    In March 1996, Qadhafi wrote to French President Jacques Chirac pledging cooperation in resolving the UTA 772 bombing. That letter stated in part:

> Libyan law, like the law of many other countries including France, does not permit the extradition of its own citizens to stand trial in foreign courts. Accordingly, I would like us to work together to find another solution which would allow a legal investigation and trial to take place which satisfies French requirements without at the same time violating the sovereignty of the Libyan Arab Jamahiriya or its laws.
>
> If the French judicial system—whose objectivity we have every reason to trust—were to arrive at the conclusion that Libyan citizens are guilty in this case, nothing should then prevent it from trying them *in absentia*, provided that such a trial is permitted under French law. The Socialist People's Libyan Arab Jamahiriya would honor its obligations under those circumstances, provided that all applicable legal requirements were satisfied.

44.    Accepting Qadhafi's invitation, Judge Bruguiere traveled to Libya in July 1996 to further his investigation. During that trip, Judge Bruguiere interviewed numerous secret service

- 12 -

officials. Among them were Moussa Koussa, then Director of Libyan Intelligence Services, who at the time of the bombing was the head of Mathaba, agent Shibani, and agent Hammouda.

45.     In addition, Libyan officials gave Judge Bruguiere several documents, one of which represented that agent Musbah had been killed in a traffic accident. This information was inconsistent with information gathered during the investigation, and it appeared that the document had been manufactured for purposes of the case. In fact, the Libyans ultimately admitted that Musbah was still alive.

46.     Libyan officials also gave Judge Bruguiere a replica of the suitcase that was used in the bombing, including the explosive pentrite and a detonator. In an awkward and transparently false attempt to prove that Libyan dissidents planted the bomb on Flight 772, the Libyans told Judge Bruguiere that the suitcase had been recovered from a thwarted attack by Libyan oppositionists. For the French, it was proof that the Libyan security services had suitcase bombs exactly like the one that exploded UTA Flight 772.

47.     As a result of his investigation in Libya, Judge Bruguiere issued two additional arrest warrants, one for agent Shibani, and one for agent Hammouda.

48.     At the end of an over eight-year exhaustive investigation, which the French officially concluded in late January 1998, the French determined that the Libyan intelligence service, LESO, was responsible for the UTA Flight 772 bombing. Specifically, the investigation revealed that agent Senoussi, as head of the Libyan secret service, gave instructions that the bombing be carried out and supplied the suitcase bomb; that agent Shibani purchased the equipment, particularly the detonator, necessary for the bomb; that agent Hammouda handled the strategic follow-up and coordination of agents Naeli, Musbah and Elazragh, who executed the bombing plot in Brazzaville; that agents Naeli and Musbah inspected the explosive device in

Brazzaville and gave it to agent Elazragh; and that agent Elazragh was the main perpetrator of

the plot in Brazzaville and supplied the recruited Congolese man with the suitcase bomb and a

ticket on UTA Flight 772.

49.    On January 29, 1998, Judge Bruguiere ordered that a statement of the evidence be

delivered to the Head of the Prosecution Department of the Court of Appeal by the District

Attorney.  The Public Prosecutor filed written charges with the clerk of the Grand Jury on March

27, 1998.

50.    Libya, however, steadfastly refused to extradite the six accused, and they refused

to appear in France on their own accord.  The defendants were thus tried *in absentia* by a French

court, a special Court of Assizes, in a three-day trial that commenced on March 8, 1999.  On

March 10, 1999, a seven-judge panel of the Court convicted the six accused and sentenced them

to life imprisonment.  The court also issued judgments on behalf of the civil plaintiffs for their

losses stemming from the bombing.  The convictions and sentences were largely symbolic as

Libya never extradited the accused, and despite overtures suggesting it would, never imposed the

sentences in Libya.  Nonetheless, the French, satisfied by the extensive evidence presented at

trial, viewed the convictions as a judgment against Libya for the bombing.

51.    In July 1999, the Libyan Government paid approximately $33 million to the

Central Agency of the Treasury of France to satisfy the civil judgments against the 6 defendants

rendered by the special court to partially compensate the 311 family members of the victims of

the bombing who took part in the criminal trial as civil parties.  The money paid by Libya also

went to compensate legal entities that participated as civil parties to the criminal proceeding to

recoup money they had paid as a result of the bombing, as well as to Air France for the

commercial loss it sustained in the bombing of UTA, whose assets it had purchased.  In paying

these judgments, Libya essentially admitted its complicity in the murder of the 170 passengers and crew aboard UTA Flight 772.

52.    On June 16, 1999, some of the civil parties that participated in the criminal proceeding leading to the conviction of the six accused, filed a criminal complaint and a civil claim against Qadhafi. In support of their allegations that Qadhafi was directly involved in and aided and abetted the bombing of Flight 772, the parties pointed to several facts established during the investigation including: (1) the individuals received logistical support from Libya, and LESO, directed by Qadhafi's brother-in-law Senoussi, was operating with Qadhafi's approval; (2) agent Elazragh left the Libyan Embassy in Brazzaville hurriedly in the wake of the bombing without any negative comment from the Libyan Ministry of Foreign Affairs; (3) Libya provided protection to the six accused despite warrants having been issued for their arrest; (4) Libyan officials gave incorrect files that falsely showed that one of the interested parties had lied to Judge Bruguiere during the course of his investigation, implying a coordination among numerous Libyan departments that only Qadhafi could have achieved; and (5) two of the convicted officials were given promotions that could not have occurred without Qadhafi's approval as a reward for the bombing.

53.    After the trial and convictions of agents Senoussi, Elazragh, Naeli, Musbah, Shibani and Hammouda, it was discovered that Libyan spies had given detailed accounts of the bombing plots for both Pan Am Flight 103 and UTA Flight 772. These spies had reported to Britain's spy agency MI6 that Qadhafi had personally ordered the bombing of the Pan Am and UTA flights. One spy code-named Piebald, a senior official of LESO that Britain recruited in North Africa in 1990 when suspicions of Libya's involvement in the Pan Am bombing grew, said that the bomb plots were orchestrated by agent Senoussi. A second source, a member of

Qadhafi's inner circle who was put in touch with Britain's secret service in 1994, said that

Qadhafi told him personally in 1988 that he had ordered an attack on an American airliner

because he was outraged at the American air strike in 1986 that killed his daughter.   This

information was never revealed during the course of the trial.

54.    Interlease, the corporate victim of UTA Flight 772, suffered substantial property

and related damage as a direct and proximate result of Defendants willful, reckless, wrongful

actions.  Despite the symbolic gratification of the French convictions, and the U.S. judgment

against the Libyan individual agents, Plaintiff knows that those convicted and found liable will

never serve the imposed sentences or satisfy the entered judgment.  To the contrary, Libya has

protected the convicted, who remain at liberty, unaffected by U.S. civil judgments.

## COUNT I

### 28 U.S.C. § 1605A(c), Private Right of Action

55.    Paragraphs 1 through 54 are incorporated herein as if fully set forth herein.

56.    Libya was a state sponsor of terrorism as described in 28 U.S.C. §

1605A(a)(2)(A)(i).  Defendants and their agents were acting within the scope of their office,

employment or agency in committing the acts alleged herein, including the planning and carrying

out of the bombing of UTA Flight 772.  Pursuant to 28 U.S.C. 1605A(c), Defendant Libya is

vicariously liable for the acts of its officers, employees, or agents.

57.    As a direct and proximate result of the willful, wrongful, intentional and reckless

acts of Defendants and their agents, Plaintiff suffered reasonably foreseeable property loss.

Pursuant to 28 U.S.C. § 1605A, Plaintiff asserts a cause of action against Defendants.

58.    Accordingly, as a result of Defendants' actions, Interlease seeks economic

damages, pursuant to 28 U.S.C. § 1605A(d), as compensation for its property loss.

WHEREFORE, Plaintiff Interlease demands judgment be entered, jointly and severally, against the Defendants in the amount of TWO HUNDRED MILLION DOLLARS ($200,000,000) and an additional amount for prejudgment interest on commercial losses suffered by Interlease.

## COUNT II

## CONVERSION

59.    Paragraphs 1 through 58 are incorporated herein as if fully set forth.

60.    As a direct and proximate result of the willful, wrongful, intentional and reckless acts of Defendants, Plaintiff Interlease was permanently deprived of its property, the DC-10 airliner.

61.    In addition to the loss of the value of the airliner, Interlease was permanently deprived of the remaining lease payments of UTA as well as any future lease payments that it could have procured.

62.    Accordingly, Interlease brings a claim for conversion against Defendants pursuant to 28 U.S.C. § 1605A, and the law of the State of Florida.

WHEREFORE, Plaintiff Interlease demands judgment be entered, jointly and severally, against the Defendants in the amount of TWO HUNDRED MILLION DOLLARS ($200,000,000) and an additional amount for prejudgment interest on commercial losses suffered by Interlease.

## COUNT III

## TORTIOUS INTERFERENCE

63.    Paragraphs 1 through 62 are incorporated herein as if fully set forth.

64.    The act of bombing UTA Flight 772 by Defendants constituted an intentional act that tortiously interfered with Plaintiff Interlease's contracts, business relations, leases, and other business operations and opportunities.

65.    As a direct and proximate result of the willful, wrongful, intentional and reckless acts of Defendants, Plaintiff Interlease was permanently deprived of the income from various contracts, leases, and other business operations and opportunities.

66.    Also as a direct and proximate cause of the willful, wrongful, intentional and reckless acts of Defendants, Plaintiff Interlease suffered damage to its business reputation, damage to its credit rating, and the loss of business contracts, leases, and other business opportunities.

67.    Accordingly, Interlease brings a claim for tortious interference against Defendants pursuant to 28 U.S.C. § 1605A, and the law of the State of Florida.

WHEREFORE, Plaintiff Interlease demands judgment be entered, jointly and severally, against the Defendants in the amount of THREE HUNDRED MILLION DOLLARS ($300,000,000), and an additional amount for prejudgment interest on commercial losses suffered by Interlease.

## COUNT IV

## PUNITIVE DAMAGES

68.    Paragraphs 1 through 67 are incorporated herein as if fully set forth.

69.    The actions of Socialist People's Libyan Arab Jamahiriya, LESO, and their agents who unlawfully, willfully, and violently destroyed the aircraft were intentional and malicious and in willful, wanton and reckless disregard of the Plaintiff's rights.

70. Pursuant to 28 U.S.C. § 1605A, which specifically authorizes punitive damages in civil actions for money damages resulting from terrorist acts, Socialist People's Libyan Arab Jamahiriya and LESO are liable for such in an amount to be determined by the court.

WHEREFORE, Plaintiff demands judgment be entered, jointly and severally, against the Defendants in an appropriate amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court grant Plaintiff judgment in its favor and against Defendants on Counts I through IV – and grant Plaintiff:

A. Compensatory damages against Defendants, jointly and severally, in the amount of $700,000,000;

B. Punitive damages against Defendants Socialist People's Libyan Arab Jamahiriya and LESO in an appropriate amount to be determined at trial;

C. Reasonable costs and expenses;

D. Prejudgment interest;

E. Reasonable attorneys' fees; and

F.    Such other and further relief which the Court may determine to be just and equitable under the circumstances.

Respectfully submitted,

*Michael L. Martinez*

Stuart H. Newberger, D.C. Bar No. 294793
Laurel Pyke Malson, D.C. Bar No. 317776
Michael L. Martinez, D.C. Bar No. 347310
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
(202) 624-2500 telephone
(202) 628-5116 facsimile

Counsel for Plaintiff

March 27, 2008

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Interlease, Inc. | The Socialist People's Libyan Arab Jamahiriya<br>Libyan External Security Organization |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF<br>(EXCEPT IN U.S. PLAINTIFF CASES) | 88888 | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT<br>(IN U.S. PLAINTIFF CASES ONLY)<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF<br>LAND INVOLVED |
|---|---|---|

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Crowell & Moring LLP<br>1001 Pennsylvania Avenue, NW<br>Washington D.C. 20004<br>(202) 624-2469 | Blank Rome, LLP<br>600 New Hampshire Avenue, NW<br>Washington, DC 20037<br>(202) 944-2723 |

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government
    Plaintiff

● 3 Federal Question
    (U.S. Government Not a Party)

○ 2 U.S. Government
    Defendant

○ 4 Diversity
    (Indicate Citizenship of
    Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place<br>of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place<br>of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a<br>Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV.  CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

| ○ A. *Antitrust* | ○ B. *Personal Injury/ Malpractice* | ○ C. *Administrative Agency Review* | ○ D. *Temporary Restraining Order/Preliminary Injunction* |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Medical Malpractice<br>☐ 365 Product Liability<br>☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act<br><br>**Social Security:**<br>☐ 861 HIA ((1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g)<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)<br>**Other Statutes**<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 890 Other Statutory Actions (If<br>    Administrative Agency is Involved) | Any nature of suit from any category may<br>be selected for this category of case<br>assignment.<br><br>*(If Antitrust, then A governs)* |

| ⊙ E. *General Civil (Other)*  OR  ○ F. *Pro Se General Civil* |
|---|

| **Real Property**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent, Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property<br><br>**Personal Property**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☒ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | **Bankruptcy**<br>☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**Prisoner Petitions**<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br><br>**Property Rights**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br><br>**Federal Tax Suits**<br>☐ 870 Taxes (US plaintiff or<br>    defendant<br>☐ 871 IRS-Third Party 26<br>    USC 7609 | **Forfeiture/Penalty**<br>☐ 610 Agriculture<br>☐ 620 Other Food &Drug<br>☐ 625 Drug Related Seizure<br>    of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 RR & Truck<br>☐ 650 Airline Regs<br>☐ 660 Occupational<br>    Safety/Health<br>☐ 690 Other<br><br>**Other Statutes**<br>☐ 400 State Reapportionment<br>☐ 430 Banks & Banking<br>☐ 450 Commerce/ICC<br>    Rates/etc.<br>☐ 460 Deportation | ☐ 470 Racketeer Influenced &<br>    Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Satellite TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/<br>    Exchange<br>☐ 875 Customer Challenge 12 USC<br>    3410<br>☐ 900 Appeal of fee determination<br>    under equal access to Justice<br>☐ 950 Constitutionality of State<br>    Statutes<br>☐ 890 Other Statutory Actions (if<br>    not administrative agency<br>    review or Privacy Act |
|---|---|---|---|

|  |  |  |  |
|---|---|---|---|
| ○ **G. Habeas Corpus/ 2255**<br><br>☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ○ **H. Employment Discrimination**<br><br>☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ○ **I. FOIA/PRIVACY ACT**<br><br>☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ○ **J. Student Loan**<br><br>☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |
| ○ **K. Labor/ERISA (non-employment)**<br><br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ○ **L. Other Civil Rights (non-employment)**<br><br>☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 Americans w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ○ **M. Contract**<br><br>☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ○ **N. Three-Judge Court**<br><br>☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

○ 1 Original Proceeding    ○ 2 Removed from State Court    ○ 3 Remanded from Appellate Court    ○ 4 Reinstated or Reopened    ○ 5 Transferred from another district (specify)    ○ 6 Multi district Litigation    ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Foreign Sovereign Immunities Act, as amended, 28 U.S.C. § 1605A. Plaintiff suffered property loss as a result of defendant's actions.

**VII. REQUESTED IN COMPLAINT**    ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    **DEMAND $** 700,000,000    Check YES only if demanded in complaint

**JURY DEMAND:**    YES ☐    NO ☐

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☒    NO ☐    If yes, please complete related case form.

DATE _____    SIGNATURE OF ATTORNEY OF RECORD _____

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.